NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0632n.06

Case Nos. 10-5944, 10-6233

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 26, 2011*

LEONARD GREEN, Clerk

CLAUDE GRANT; ORALENE DAY; )
PRINCESS MARTINDALE; FALETHA B. )
REID; DARRYL MCKIBBENS; DARREL )
GANT; ANTONIO MCKISSACK; PAMELA )
TUCKER; and SANDRA DERRICK, )
individually and on behalf of all others )
similarly situated, )
    )    ON APPEAL FROM THE
    )    UNITED STATES DISTRICT
    Plaintiffs-Appellees,    )    COURT FOR THE MIDDLE
    )    DISTRICT OF TENNESSEE
    v.    )
    )
METROPOLITAN GOVERNMENT OF )
NASHVILLE AND DAVIDSON COUNTY, )
TENNESSEE, )
    )
    Defendant-Appellant.    )
    )
_____ )

BEFORE: BATCHELDER, Chief Judge; CLAY and SUTTON, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. In this class action lawsuit alleging racial discrimination, the district court entered judgment for Plaintiffs after a bench trial on their disparate impact claims. Because we find that Plaintiffs failed to establish a prima facie case of disparate impact liability, we reverse.

I.

Nine named plaintiffs filed this class action under Title VII of the Civil Rights Act of 1964 ("Title VII") against Defendant-Appellant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro"). The named plaintiffs are current and former employees of Metro

Water Services ("MWS"), a subdivision of Metro. They alleged various violations of Title VII on behalf of themselves and all others similarly situated.[1] Specifically, Plaintiffs claimed that MWS engages in systemic practices of discrimination against black employees in post-hiring opportunities, including disparate job assignments, promotions, pay, accommodations, discipline, and other terms and conditions of their employment. Plaintiffs presented disparate treatment and disparate impact theories of liability.[2]

During the bench trial, Plaintiffs sought to establish their case through anecdotal evidence and expert testimony. Plaintiffs' expert, Dr. Moomaw, examined the proportion of black employees across numerous categories of MWS's workforce, including FLSA exempt status, salary type, and pay grade. He found that black employees at MWS were disproportionately represented in lower-paying positions which had fewer supervisory responsibilities and fewer opportunities for advancement. Dr. Moomaw concluded that black employees' placement into those jobs limited their opportunities for promotions and higher earnings.

---

[1] The district court granted Plaintiffs' motion for class certification, certifying as a class "all former, current, and future African-American employees of the Metropolitan Government of Nashville and Davidson County, Metro Water Services from the period January 1, 2000 to the present."

[2] After a full trial, a jury ruled in favor of Metro on Plaintiffs' disparate treatment claims. The district court reserved the question of disparate impact liability. Plaintiffs moved for a new trial, and the district court granted the motion. Metro appealed the district court's decision to grant a new trial, and a prior panel of this Court dismissed Metro's appeal, but ordered the district court to rule on the disparate impact claims. *See In re Metro. Gov't of Nashville & Davidson Cnty.*, 606 F.3d 855 (6th Cir. 2010). Accordingly, the disparate treatment claims (which are awaiting a new trial) are not before us at this time.

Based on Plaintiffs' evidence, the district court held that they had presented a prima facie case of disparate impact discrimination.[3] Upon determining that Plaintiffs were entitled to judgment on their disparate impact claims,[4] the district court awarded them back pay, the amount of which would be determined by a Special Master appointed by the court. The court further awarded immediate injunctive relief by prohibiting MWS from conducting oral interviews for MWS promotions, imposing an interview requirement for MWS lateral transfers, and ordering a Special Master to conduct oral interviews and validate all MWS job requirements. Metro filed a timely notice of appeal.

In the meantime, the district court appointed Dr. Kathleen Lundquist as Special Master in the case to conduct oral interviews and oversee the promotions process. Alleging that Dr. Lundquist had a conflict of interest that precluded her from serving as Special Master and that the district court failed to follow Rule 53's procedures, Metro moved the district court to revise its appointment. Although the motion was unopposed, the district court denied Metro's motion. Metro filed a timely supplemental appeal. This Court consolidated the two appeals.

**II.**

---

[3]Metro also provided expert testimony. Metro's expert, Dr. White, focused on the actual promotions that had occurred within MWS and concluded that there was no statistically significant difference between the promotion rate of black employees as compared to white employees. Indeed, Dr. White found that black employees actually advanced at a rate slightly *greater* than their representation in MWS's workforce. However, the district court determined that Dr. Moomaw's evidence was more persuasive than Dr. White's. The court explained that Dr. Moomaw's analysis, "[w]hile necessarily imperfect," was a better comparison given that it analyzed "blacks in higher level positions compared to the overall black to white ratio at MWS."

[4]The district court held that Metro did not demonstrate that its practices were justified by business necessity. Metro has not challenged that conclusion on appeal.

As an initial matter, we must address Plaintiffs' motion to dismiss this appeal for lack of jurisdiction. Plaintiffs argue that we lack jurisdiction to review the merits of the district court's opinion and that we may only consider the question of whether the district court abused its discretion by granting injunctive relief.

It is well-established that we have jurisdiction over appeals from interlocutory orders that grant or deny injunctive relief. *See* 28 U.S.C. § 1292(a)(1). There is no dispute that some aspects of the district court's order awarded injunctive relief, namely the component which orders Metro Civil Services Commission ("MCSC") to conduct oral interviews and bars MWS from participation.[5] This aspect of the district court's order is directed to Metro and MWS, enforceable by contempt, and designed to provide the relief sought by Plaintiffs in their complaint. Accordingly, this Court has jurisdiction to review the district court's order. *See* 28 U.S.C. § 1292(a)(1); *Abercrombie & Fitch Co. v. Fed. Ins. Co.*, 370 F. App'x 563, 568 (6th Cir. 2010).

As a general matter, we limit our review under § 1292(a)(1) to decide "only whether the district court abused its discretion in ruling on the request for relief." *Jones v. Caruso*, 569 F.3d 258, 269 (6th Cir. 2009) (quotation marks omitted). But in making that determination, we also have "jurisdiction to reach the merits, at least where there are no relevant factual disputes and the matters to be decided are closely related to the interlocutory order being appealed." *Id.*; *see also Doe v. Sundquist*, 106 F.3d 702, 707 (6th Cir. 1997).

---

[5]The order does, however, permit MWS to designate a proctor to attend the interviews.

In order to review the district court's decision to grant injunctive relief in this case, we must look at the district court's disparate impact determination—the basis for that injunctive relief. We cannot determine whether the district court abused its discretion in awarding injunctive relief unless we first determine whether the district court's finding of liability was correct. Accordingly, we will exercise our jurisdiction to review the merits of the district court's legal determination. Plaintiffs' motion to dismiss is DENIED.

### III.

"This Court's standard of review in a Title VII discrimination case is narrow." *Dunlap v. Tenn. Valley Auth.*, 519 F.3d 626, 629 (6th Cir. 2008) (quotation marks omitted). While we review legal conclusions de novo, *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008), we review the district court's findings of fact for clear error, *Dunlap*, 519 F.3d at 629. In reviewing the court's factual findings, "[t]he issue is not whether the district court reached the best conclusion, but whether the evidence before the court supported the district court's findings." *Id.* (citation omitted).

On appeal, Metro argues that Plaintiffs failed to establish their prima facie case of disparate impact discrimination, so we limit our discussion accordingly.[6] A prima facie case of disparate impact discrimination under Title VII requires a plaintiff to (1) identify a specific employment

---

[6]Metro also argues that Plaintiffs' claims should not be analyzed under a disparate impact theory at all because they are more amenable to a disparate treatment analysis. However, a Title VII plaintiff is not required to choose one discrimination theory to the exclusion of the other. *See, e.g.*, *Dunlap*, 519 F.3d at 629 (plaintiff relied on both theories to establish discrimination); *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1192-93 (6th Cir. 2006) (same); *Acree v. Tyson Bearing Co., Inc.*, 128 F. App'x 419, 426 (6th Cir. 2005) (stating that "a plaintiff may rely upon one of two alternate theories of recovery to establish a claim of illegal discrimination"). Further, a plaintiff may rely on the same set of facts to establish liability under either theory. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

practice and (2) present relevant statistical data that the challenged practice has an adverse impact on a protected group. *Id.*

**A.**

Regarding the first prong of the prima facie case, the Supreme Court has explained that a plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *see also Wal-Mart Stores, Inc. v. Dukes*, — S. Ct. —, 2011 WL 2437013, at *10 (2011). However, if a plaintiff demonstrates that "the elements of [an employer's] decisionmaking process are not capable of separation or analysis, [then] the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. § 2000e-2(k)(1)(B)(i); *see also Phillips v. Cohen*, 400 F.3d 388, 398 (6th Cir. 2005). Metro claims that Plaintiffs never isolated and identified specific employment practices, and that they failed to demonstrate that the practices are incapable of separation.

Plaintiffs' general claim is that MWS has engaged in "preselection" which caused an adverse, disparate impact on black employees. They allege that this preselection has taken many forms, including tailored job qualifications, selective interviewing, and subjective decisionmaking. The problem, however, is that Plaintiffs make no effort to isolate any of these practices or to examine their individual effects on the promotions process. *See Watson*, 487 U.S. at 994; *see also* 42 U.S.C. § 2000e-2(k)(1)(B)(i).

Plaintiffs' failure to identify and isolate the effects of each specific employment practice could have been forgiven if they had "demonstrate[d] to the court that the elements of [Metro's]

decisionmaking process are not capable of separation for analysis." *See* 42 U.S.C. § 2000e-2(k)(1)(B)(i). But they never made any such showing. Although they purported to challenge the decisionmaking process as a whole, they never attempted to demonstrate that the elements of that process are incapable of separation for analysis.

The district court appears to have assumed that merely challenging the promotions process as a whole is sufficient to take advantage of the statutory exception, but that is simply not the law. The law clearly requires plaintiffs to identify and isolate specific employment practices. *See* 42 U.S.C. § 2000e-2(k)(1)(B)(i). A plaintiff may challenge the process as a whole only if he *first* demonstrates that its elements are incapable of separation. *See id.* The district court erred by allowing Plaintiffs to reap the advantages of the statutory exception without first meeting its requirements.

**B.**

Even if Plaintiffs had satisfied the first prong of their prima facie case, their claim would nevertheless fail on the second prong. Plaintiffs simply did not present relevant statistical data that MWS's promotion practices caused an adverse, disparate impact on its black employees.

The Supreme Court has explained that "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994. In cases involving promotion policies, "the relevant inquiry is comparing the number of protected group members benefitting from promotions with the number seeking them; this figure is then contrasted with the corresponding ratio for the non-protected group." *Phillips*, 400 F.3d at 399; *see*

*also Phillips v. Gates*, 329 F. App'x 577, 581 (6th Cir. 2009). Plaintiffs may rely on this comparison without regard to candidates' qualifications. *See Phillips*, 400 F.3d at 400. In instances where the data regarding qualified or eligible applicants is incomplete or unavailable, plaintiffs may rely on other statistics, "such as measures indicating the racial composition of otherwise-qualified applicants for at-issue jobs." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 651 (1989) (quotation marks omitted), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071, 42 U.S.C. § 2000e-2(k).[7]

In this case, Plaintiffs' evidence was merely a description of the racial demographics of MWS's workforce. Dr. Moomaw's testimony demonstrated that black employees at MWS were disproportionately concentrated in positions which paid less and had fewer opportunities for advancement. Dr. Moomaw focused specifically on the representation of "blacks in higher level positions compared to the overall black to white ratio at MWS." He did not look at actual promotion rates, nor did he compare the ratios of black and white employees eligible for promotions with those who actually received promotions. He explained that, in light of MWS's alleged practice of altering job qualifications and criteria, it was impossible to determine who was actually eligible for promotions.

Plaintiffs' evidence falls short of the relevant statistical data that the law requires. First, it compares the wrong groups of people. Instead of comparing the employees who actually applied for

---

[7]The 1991 amendments superseded some aspects of *Wards Cove*. They permit a plaintiff to challenge an employer's decisionmaking process as a whole if its elements are not capable of separation; and they also superseded portions of *Wards Cove* pertaining to the "business necessity" defense. *See Phillips*, 400 F.3d at 397-98. The Amendments did not disturb the aspect of *Wards Cove* pertaining to statistical evidence, and its holdings on that issue remain the law. *See id.* at 399.

or were eligible for promotions with those who received them, *see Phillips*, 400 F.3d at 399, Plaintiffs compared the proportion of black employees in high-paying positions with the proportion of black employees within the entire MWS workforce. Plaintiffs allege that it was futile to examine actual applicant data because MWS's allegedly discriminatory practices discouraged black employees from applying for promotions; however, in such cases, a plaintiff is still required to construct a generally qualified applicant pool. *See Wards Cove*, 490 U.S. at 651. In this case, Plaintiffs constructed a pool consisting of the entire MWS workforce, apparently assuming that custodians, equipment operators, painters, secretaries, and customer service representatives are qualified to work as engineers, biologists, and chemists. The Supreme Court has made clear that this type of analysis is deficient. *See id.* at 653-54.

Additionally, the district court's determination that each segment of MWS's workforce should mirror the overall racial demographic of MWS amounts to an impermissible quota system. *See id.* at 652. Essentially, Plaintiffs' evidence shows only that black employees are disproportionately represented in lower-paying jobs that have fewer opportunities for advancement. However, "[r]acial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions, even where workers for the different positions may have somewhat fungible skills . . . ." *See id.* at 653.

**IV.**

Because we find that Plaintiffs have failed to meet their prima facie case of disparate impact discrimination, we **REVERSE** the district court's order.  In light of this holding, we **DISMISS** as moot Metro's appeal as to the order appointing Dr. Kathleen Lundquist as Special Master.

**CLAY, Circuit Judge, dissenting.** The decision below was based on the extensive evidentiary record that was developed over nine days of trial. The trial judge heard testimony from more than twenty witnesses, including two expert statisticians, and received hundreds of documents into evidence. In stripping Plaintiffs of their victory, the majority ignores this evidentiary record and relies instead on a series of largely unexplained conclusions. Because the district court committed no error of law, and the factual findings underpinning its decision are not clearly erroneous, we should affirm. The majority has no legal basis to do otherwise, and therefore I respectfully dissent.

The majority reverses the district court's finding of liability against Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") on the basis that "Plaintiffs failed to establish a prima facie case of disparate impact liability." (Maj. Op. at 1.) To make out a prima facie case of disparate impact in violation of Title VII, a plaintiff must "(1) identif[y] a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[] that the challenged practice has an adverse impact on a protected group." *Dunlap v. Tenn. Valley Auth.*, 519 F.3d 626 (6th Cir. 2008) (citations omitted); *see also Lewis v. City of Chicago*, 130 S. Ct. 2191, 2197 (2010). The district court, sitting as finder of fact, found that Plaintiffs had satisfied their prima facie burden, and as explained below, its conclusion should be upheld as to each element of the prima facie case.

### A.    Identification of Specific Employment Practices

The district court did not err in finding that Plaintiffs' burden of identifying the specific employment practices that are challenged "is established by a preponderance of the evidence," through proof of the following: "tailoring job qualifications for promotions, lateral transfers,

selective interview processes for promotions, out-of-class assignments and subjective decision-making standards for promotions and discriminatory compensation practices." (Dist. Ct. Op. at 58-59); *see also Phillips v. Gates*, 329 F. App'x 577, 580 (6th Cir. 2009) (finding sufficient, as to the first element, a challenge to the "practices and procedures regarding employee promotions"); *Scales v. J.C. Bradford & Co.*, 925 F.2d 901 (6th Cir. 1991) (sustaining challenge to promotion practices, specifically: (1) failure to advertise openings; (2) favoritism to friends and associates of supervisors; and (3) use of subjective criteria).

The specific employment practices identified by Plaintiffs as discriminatory are well documented in the record. The district court found that Defendant's posted minimum job qualifications "are frequently tailored or altered from the original job descriptions to fit the person whom [] management desires to fill the specific position." (Dist. Ct. Op. at 6.) "As a factual matter," the court explained, "the proof also clearly establishes that [Metro's Water Services Department ("MWS")] distorts educational requirements, seniority, and experience in its promotion decisions of its white employees." (*Id*. at 65.) In one instance, Metro eliminated a bachelor's degree requirement for a director position after a qualified black employee applied, and awarded the position to a white applicant without a degree, even though the previous director had both bachelor and master's degrees. (*Id.* at 12-13.)

With regard to lateral transfers, the district court found that Metro frequently permits white employees to transfer internally, thereby circumventing the competitive employment application process. (*Id.*) To the extent that the competitive application process was utilized, the district court found that Defendant's department managers possess discretion over whom to interview for

promotions, and once the relevant employees are identified, the usual practice is that each employee's supervisor will serve on the interview panel. This results in a highly subjective—and problematic—process. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011) ("[A]n employer's undisciplined system of subjective decisionmaking [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination." (internal citation and quotation marks omitted; alteration in original)). The problems of this subjective process are exacerbated by the frequent variations in the size and composition of interview panels, and the heavy (and sometimes controlling) weight accorded the results of an oral interview.

Additionally, the district court found that Metro has a policy whereby an employee may be assigned to fill a temporary vacancy in a higher position—a so-called "out of class assignment"— and that after 100 days, the employee would be promoted into the higher position. (Dist. Ct. Op. at 16-19.) White employees, including six individuals identified at trial, would receive the promotion after 100 days, whereas black employees often would not. (*Id.* at 17.) Additionally, black employees working "out of class" are not always paid at the higher "out of class" rate, even though white employees were. In one situation, as proved at trial, a black employee assumed the duties of a public information officer on an "out-of-class" basis, but was told he was not qualified to fill the position on a permanent basis, even though the position was later filled by a biologist without any public relations background, at a higher salary than the temporary employee. (*Id.* at 19.) Situations like these are consistent with black employees, as the district court found, being "concentrated in lower job classifications at lesser compensation levels." (*Id.* at 60.)

The majority does not explain why the specific employment practices proved by Plaintiffs at trial, and identified by the district court, failed to satisfy Plaintiffs' burden of identification. The majority identifies no factual finding by the district court that is clearly erroneous, and cites no legal authority to support its conclusion. This sort of truncated analysis is particularly troubling in light of the nature and significance of this case—a civil rights class action against a major public employer—and the availability of extensive evidence in the record.

B.      Disparate Impact

The district court additionally did not err in finding that Plaintiffs carried their burden to establish that the challenged practices have an adverse impact on a protected group. The district court held that "[t]he specific employment practices alone and in combination have had the effect of denying and delaying promotions to black employees [at Metro], as set forth by Dr. [Michael] Moomaw's testimony and analyses and Plaintiffs' other proof." (*Id.* at 59.) The majority offers no reason why this conclusion was clearly erroneous.

As to the statistical proof, the district court concluded based on a binomial distribution analysis that the rate of promotions of black employees, across nearly every job category, was three to four standard deviations lower than would be expected in the absence of discrimination. *See Vogel v. City of Cincinnati*, 959 F.2d 594, 600 (6th Cir. 1992); *see also Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 419 (6th Cir. 1999) (Batchelder, J., concurring in part and dissenting in part) (reasoning that district court did not clearly err in finding disparate impact "[g]iven the extreme statistical disparity" proved at trial). This analysis reflected the report of Dr. Moomaw, who recategorized the MWS workforce and analyzed employment data across four

14

dimensions, finding "stark and significant differences in representation between white and black employees that extend to all categories of MWS' positions." (Dist. Ct. Op. at 33); *see also Phillips*, 329 F. App'x at 581 (stating that "'sufficiently substantial' statistical disparities raise an inference of disparate impact").

The district court determined that these "widespread statistical imbalances" were a result of the employment practices challenged by Plaintiffs. (Dist. Ct. Op. at 60.) Rather than determining the effect of each challenged practice, which it found were "not capable of separation for analysis," the district court analyzed Metro's promotion practices as "one promotion practice." *See* 42 U.S.C. § 2000e-2(k)(1)(B)(i) (stating that if a "complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice"). The majority disagrees with the district court's decision to treat the promotional process as one practice, because, as it states, Plaintiffs "never attempted to demonstrate that the elements of that process are incapable of separation of analysis." (Maj. Op. at 7.) But the majority offers no legal authority or citation to the record, or elucidates why the district court's finding in that regard is clearly erroneous.

Considering the process as a whole, the district court made the following factual findings as to the cause of the statistical abnormalities, none of which the majority contends is clearly erroneous:

> MWS's practice of tailoring job descriptions involves removing job requirements for higher positions to favor MWS's white employees. MWS's altered educational requirements for positions that have the actual effect of increasing the number of white employees promoted.
>
> Lateral transfers have the effect of denying MWS's black employees from promotions to higher level positions. MWS used selective oral interviews with open discussion of scoring among panel members, and the results of the oral interview

15

represented from 50% to 80% or 100% of the selection decision, thus undermining the applicant's seniority and experience.

. . . MWS's misuse of out-of-class assignments resulted in the denial of promotions to black employees that were given to MWS's white employees. MWS also delayed higher compensation paid to black employees who worked six months to two years on an "out-of-class" basis. These black employees were not promoted as white MWS employees were and had to file grievances and objections to receive the higher pay required by the "out-of-class" policy for such work. . . .

MWS's compensation practice . . . resulted in compensation levels of black employees who are also concentrated in the lowest grade levels within the same pay ranges for white employees. The statistics also show that black employees at MWS are also concentrated in lower job classifications at lesser compensation levels. . . .

(Dist. Ct. Op. at 59-60.)

The majority overturns the district court's finding because, as it explains, "Plaintiffs simply did not present relevant statistical data that MWS's promotion practices caused an adverse, disparate impact on its black employees." (Maj. Op. at 7.) According to the majority, "Plaintiffs' evidence was merely a description of the racial demographics of MWS's workforce." (*Id.* at 8.) The majority explains that Plaintiffs' statistical evidence "falls short" because, "instead of comparing the employees who actually applied for or were eligible for promotions with those who received them, Plaintiffs compared the promotion of black employees in high-paying positions with the proportion of black employees within the entire MWS workforce." (*Id.* at 9.) Even if the latter comparison was problematic, the majority continues, Plaintiffs were "still required to construct a generally qualified applicant pool" from which to make a comparison. (*Id.*)

As an initial matter, the majority's insistence on a specific form of statistical evidence has no basis in our case law. We have never "limited a plaintiff's choices in Title VII cases involving statistical analysis in any way," *Isabel v. City of Memphis*, 404 F.3d 404, 412 (6th Cir. 2005), and,

16

as the Supreme Court recognizes, statistics "come in infinite variety and . . . their usefulness depends upon all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339-40 (1977). The statistical evidence relied upon by the district court was relevant, and to the extent it was less than perfect, "such flaws relate to the weight of the [evidence] which is a matter for the trier of fact." *Phillips v. Cohen*, 400 F.3d 388, 401-02 (6th Cir. 2005). The majority offers no legal authority to support its argument that the district court's evaluation of the statistical evidence was improper as a matter of law. *See Johnson v. U.S. Dep't of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir. 1994) (holding that the district court's view of the sufficiency of statistical evidence is reviewed for clear error).

Moreover, comparing rates of actual promotion would be unhelpful in this case because, as the district court found, that comparison would not capture the reality of the promotions process at MWS. First, it would understate the promotion rate of white employees. Based on the trial record, the district court found that through "lateral transfers" and "out of class" assignments, MWS would frequently promote white employees outside of the normal application process. Second, it would overstate the promotion rate of black employees because, as the district court found, MWS, and its promotion process more generally, discouraged black employees from applying for promotions; this was accomplished by informing potential applications that the position was "not an appropriate fit;" permitting subjective evaluations by hiring managers; and altering job requirements to fit preselected candidates. *See Kreuzer v. Brown*, 128 F.3d 359, 364 n.2 (6th Cir. 1997) (citing *Harless v. Duck*, 619 F.2d 611, 617-18 (6th Cir. 1980)).

The majority suggests that Plaintiffs' failure to compare actual promotion rates could be excused if Plaintiffs had "construct[ed] a generally qualified applicant pool" and compared the promotion rates within that pool. (Maj. Op. at 9.) Such a statement, however, reflects the majority's fundamental misunderstanding of this case. As the district court found, "the proof . . . clearly establishes that MWS distorts educational requirements, seniority, and experience in its promotion decisions of its white employees," and it is therefore not possible to determine the actual qualifications for many positions. (Dist. Ct. Op. at 65.)

Additionally, even if the actual qualifications for each position could be determined, any failure to control for this variable is not fatal under the circumstances of this case, given the extent to which Metro obfuscated and apparently manipulated the promotion process. *See Phillips*, 400 F.3d at 400-02 (reversing district court's dismissal of disparate impact challenge to promotion process, and reasoning that the plaintiff's failure to control for employees' qualifications in statistical data did not render its statistics legally insufficient). The majority's reasoning to the contrary runs counter to well-established case law in this Circuit. *See id.* (citing *Scales*, 925 F.2d at 906 (finding gender discrimination on the basis that it took women longer than men to be promoted to the first managerial level in the company)).

Finally, the majority ignores the non-statistical evidence adduced at trial, thereby ignoring the extensive testimony by individual plaintiffs as to their "personal experiences with promotion decisions at MWS." (Dist. Ct. Op. at 19-25); *see also Int'l Bhd. of Teamsters*, 431 U.S. at 340 ("The individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life."). Our cases have recognized that "expert statistical evidence in

18

disparate impact cases is not to be considered in a vacuum, as the only evidence permitting plaintiffs to meet their prima facie test; it must be considered in light of all the evidence in the record." *Phillips*, 400 F.3d at 401 (holding that non-statistical evidence of disparate of impact "compensate[ed] to some degree for plaintiffs' failure to demonstrate conclusively that they are promoted at lower rates than white employees." (internal citation and quotation marks omitted)); *see also Wal-Mart Stores*, 131 S. Ct. at 2556 (recognizing the relevance of testimonial evidence apart from statistical evidence in disparate impact cases). This point is lost on the majority.

Accordingly, because the district court committed no error of law, and the findings of fact underlying its decision are not clearly erroneous, we should affirm. The majority refuses to do so, and I respectfully dissent.